**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 18-cv-0314-WJM-STV

ROCKY MOUNTAIN WILD, a Colorado non-profit corporation,

    Plaintiffs,

v.

UNITED STATES BUREAU OF LAND MANAGEMENT, a federal agency, and
UNITED STATES DEPARTMENT OF INTERIOR, a federal agency,

    Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
SUMMARY JUDGMENT MOTION, AND DENYING
PLAINTIFF'S SUMMARY JUDGMENT MOTION**

---

    Plaintiff Rocky Mountain Wild alleges that Defendants United States Bureau of Land Management and United States Department of the Interior (together, "BLM") failed to respond properly to Rocky Mountain Wild's October 2017 request for agency records under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking information about certain parcels that BLM was (at the time of the FOIA request) preparing to offer for oil and gas leasing.

    Currently before the Court is BLM's Motion for Summary Judgment (ECF No. 35) and Rocky Mountain Wild's Cross Motion for Summary Judgment or in the Alternative for a Stay of Briefing and Leave to Carry Out Rule 56(d) Discovery (ECF No. 37). For the reasons explained below, the Court grants BLM's motion on all issues except for the scope of search as it relates to which lease parcels were within the scope of the FOIA request. As to that, BLM must conduct a further search. The Court denies Rocky

Mountain Wild's cross motion because its argument for a general right to discovery in FOIA cases is contrary to binding case law, and Rocky Mountain Wild does not otherwise establish a need for discovery in this case.

## I. LEGAL STANDARD

### A. General Standard

"FOIA actions are typically decided on motions for summary judgment." *INFORM v. BLM*, 611 F. Supp. 2d 1178, 1182 (D. Colo. 2009). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### B. Reasonableness of Search vs. *De Novo* Review of Exemptions

As will become clear below, most of the parties' disputes turn on whether BLM conducted an adequate search for responsive records. In this regard, BLM relies on a declaration from the Colorado BLM office's current FOIA Officer, Laura Garcia-Hinojosa, describing BLM's search efforts. (*See* ECF No. 35-1.)

Rocky Mountain Wild describes Garcia-Hinojosa's declaration as "little more than a series of conclusory statements based largely on vague memories of other agency personnel involved in the search." (ECF No. 37 at 7.)[1] The Court will address the accuracy of this characterization in Part I.C, below. In any event, this assertion is Rocky Mountain Wild's jumping-off point into an extended attack on federal agencies' ability to rely on declarations such as these, without normal discovery procedures. (*See* ECF No. 37 at 7–13.) Rocky Mountain Wild argues that the Court's duties under FOIA and Rule 56 "cannot be satisfied without a litigation mechanism that allows [Rocky Mountain

---

[1] All ECF page citations are to the page number in the CM/ECF header, which does not always match the document's internal pagination, particularly in exhibits.

Wild], and the Court, to test the basis and accuracy of Laura Garcia-Hinojosa's

conclusory statements." (*Id.* at 7–8.) Rocky Mountain Wild emphasizes that FOIA

authorizes district courts to conduct *de novo* review (the meaning of which the Court will

address shortly) and accordingly asserts that

> [r]elying on FOIA declarations that are not scrutinized in light
> of [the plaintiff's] assessment of information gained via initial
> disclosures, discovery, admissibility/evidentiary rules, cross
> examination, or the normally understood features of *de novo*
> review in the adversarial judicial system would effectively re-
> write the statute and relinquish the federal judicial function
> set out in FOIA's plain language to the agency itself.

(*Id.* at 10–11 (citing 5 U.S.C. § 552(a)(4)(B)).) In other words, Rocky Mountain Wild

argues that FOIA plaintiffs should receive discovery—and, if needed, a trial—to the

same extent as plaintiffs in any other kind of civil suit. This is the focus of Rocky

Mountain Wild's cross-motion for summary judgment. (*See* ECF No. 37 at 7–13.)

Rocky Mountain Wild's argument contradicts Tenth Circuit case law, which this

Court must follow. That case law says that "[t]he decision whether to allow discovery in

FOIA cases is left largely to the discretion of the district court judge." *World Publ'g Co.*

*v. U.S. Dep't of Justice*, 672 F.3d 825, 832 (10th Cir. 2012). "Discovery relating to the

agency's search and the exemptions it claims for withholding records generally is

unnecessary if the agency's submissions are adequate on their face, and a district court

may forgo discovery and award summary judgment on the basis of submitted affidavits

or declarations." *Trentadue v. FBI*, 572 F.3d 794, 807 (10th Cir. 2009) ("*Trentadue-*

*FBI*"). Indeed, although a declaration is "not cross-examined testimony," "declarations

and affidavits are the widely accepted, even the preferable, means for an agency to

respond to concerns about the adequacy of a FOIA search." *Id.*

A widely-followed approach in the federal courts is that, "once the agency has

satisfied its burden" to submit affidavits, declarations, and/or other summary judgment materials that are "adequate on their face," a plaintiff requesting discovery "must make a showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations." *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994) (citation omitted), *cited with approval in Liverman v. OIG*, 139 F. App'x 942, 945 (10th Cir. 2005).

Against this, Rocky Mountain Wild asserts that "the Circuit Courts[] [have] incremental[ly] drift[ed] away from the words of the statute," referring to the *de novo* review requirement. (ECF No. 37 at 11.) Even if true, a district court cannot simply decide that the circuit court got it wrong and then go its own way.

Regardless, Rocky Mountain Wild misunderstands FOIA's *de novo* review mandate. The relevant statutory language is as follows:

> On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action.

5 U.S.C. § 552(a)(4)(B). What, specifically, is the "matter" that the district courts may "determine" *de novo*? It is something less than the whole case—"In *such a case* the court shall determine *the matter* de novo . . . ." (emphasis added)—and the surrounding statutory language all but dictates that the "matter" in question is the agency's exemption claims. *Cf. Anderson v. Dep't of Health & Human Servs.*, 907 F.2d 936, 941

4

(10th Cir. 1990) ("When an action is brought under the FOIA to obtain information in the possession of a government agency, the district court must review de novo *the agency's decision not to disclose the requested materials*." (emphasis added)).

When the Court reviews BLM's exemption claims (in Part III.B, below), the Court will—because it must—review those claims *de novo*, or in other words, without deference to the agency's decisions. *See* Black's Law Dictionary, *s.v.* "review" (11th ed. 2019) (defining "de novo review" as "[a] court's nondeferential review of an administrative decision"). As for the adequacy of the agency's search efforts, FOIA itself establishes no standard of review. The Tenth Circuit, along with many other circuits, has filled in this gap by concluding that "an agency's search for records need only be reasonable in scope and intensity." *Trentadue-FBI*, 572 F.3d at 797 (citing cases).

> In light of the reasonable-search requirement, the focal point of the judicial inquiry is the agency's search process, not the outcome of its search. The issue is not whether any further documents might conceivably exist but rather whether the government's search for responsive documents was adequate, which is determined under a standard of reasonableness, and is dependent upon the circumstances of the case.

*Id.* (internal quotation marks omitted; alterations incorporated).

In light of this case law—which the Court is bound to follow even if it disagreed—the Court rejects Rocky Mountain Wild's argument that it is generally entitled to discovery.

## C. Whether Discovery is Justified in this Case

Discovery may still be appropriate if Rocky Mountain Wild "make[s] a showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or

declarations." *Carney*, 19 F.3d at 812.  Rocky Mountain Wild asserts two case-specific arguments in this regard, which the Court will address in turn.

First, Rocky Mountain Wild describes Garcia-Hinojosa's declaration as "little more than a series of conclusory statements based largely on vague memories of other agency personnel involved in the search."  (ECF No. 37 at 7.)  The fact that Garcia-Hinojosa reports others' knowledge is a separate issue the Court will address below in Part I.D.  As for the "conclusory" accusation, Rocky Mountain Wild is incorrect.  Garcia-Hinojosa's declaration is thirty-two pages long, and as detailed as its length suggests, reporting numerous relevant names, dates, search techniques, search terms, and so forth.  (ECF No. 35-1 at 2–33.)

Second, Rocky Mountain Wild says that "[i]t is almost certain that agency personnel prepared written records to document the steps taken to fulfill FOIA requests, but no such search records were disclosed to [Rocky Mountain Wild] and no search documentation was provided to the Court to support the statements made in the declaration."  (ECF No. 37 at 7.)  Rocky Mountain Wild cites nothing to support this. Earlier in its brief, it claims that various BLM employees maintained contemporaneous written records of their FOIA searches, but Rocky Mountain Wild likewise cites nothing to support these assertions.  (*See id.* at 4–5, ¶¶ 14–19.)  BLM denies these assertions (*see* ECF No. 39 at 5), but regardless, assertions of fact unsupported by record evidence do not create a genuine issue of material fact.  *See* Fed. R. Civ. P. 56(c)(1); WJM Revised Practice Standard III.E.3.

Rocky Mountain Wild has thus failed to make a showing sufficient to justify

discovery in this case.[2]

## D.    Personal Knowledge Objection

Finally, Rocky Mountain Wild generally objects to Garcia-Hinojosa's reliance on others' reports regarding their search efforts, arguing that she lacks personal knowledge.  (ECF No. 36 at 2.)  In FOIA cases, however, a FOIA officer who supervised the search is competent to report on what others reported to her about their searches for responsive records.  *See DiBacco v. Dep't of the Army*, 926 F.3d 827, 833 (D.C. Cir. 2019); *Carney*, 19 F.3d at 813–14; *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1358 (D.C. Cir. 1983).

As will become clear below, BLM conducted two rounds of searches.  Garcia-Hinojosa worked directly with the former FOIA Officer to coordinate the first search, and she *was* the FOIA Officer for the second search (the previous officer had, by that time, left BLM, and Garcia-Hinojosa was promoted).  The Court finds this sufficient to overrule Rocky Mountain Wild's personal knowledge objection.

## II.  FACTS

The following facts are undisputed unless attributed to a party or otherwise noted.

## A.    The FOIA Request & Initial Evaluation

At some point on or before October 19, 2017—the record is not clear on precisely when—Rocky Mountain Wild learned that BLM planned to offer certain oil and gas leases in Colorado beginning in March 2018.  On October 19, 2017, Rocky

---

[2] Rocky Mountain Wild asserts that most of its admissions to BLM's Statement of Material Facts are only qualified admissions because Rocky Mountain Wild has been denied discovery.  (ECF No. 36 at 2–3.)  Because the Court has rejected Rocky Mountain Wild's argument about discovery generally, and in this case specifically, the Court also rejects Rocky Mountain Wild's attempt to qualify its admissions.

Mountain Wild submitted a FOIA request to BLM's Colorado state office.  The "RE:" line of that request reads as follows: "Freedom of Information Act Request for all agency records involving the proposed March 2018 oil and gas leasing of parcels in and around occupied Gunnison sage-grouse habitat (Parcels 7981, 7982, 7983, 7984, 7985, and 7986) and within the Gypsum Valley Area of Critical Environmental Concern ('ACEC') (Parcel 7987)."  (ECF No. 35-1 at 35.)  The request then states that Rocky Mountain Wild seeks "copies of all agency records created or obtained for the purposes of preparing and implementing the March 2018 offering of lease sale parcels 7981, 7982, 7983, 7984, 7985, 7986 and 7987."  (*Id.*)  The Court will refer to the numbered parcels collectively as the "Proposed Parcels."  The request goes on to explain that it is "time sensitive due to ongoing agency decisionmaking and because these parcels, if leased and developed, have the potential to negatively impact the Endangered Species Act listed Gunnison sage-grouse and values within an ACEC."  (*Id.*)

At the time BLM received the request, the FOIA Officer in the Colorado state office was Brian Klein.  (ECF No. 35-1 at 9, ¶ 22 n.1.)  Klein, working with Garcia-Hinojosa (then the FOIA Specialist for the Colorado state office), determined that BLM's Tres Rios Field Office (in Dolores, Colorado) was responsible for the region encompassing the Proposed Parcels, and therefore Tres Rios employees would likely have responsive records.  (ECF No. 35 at 3, ¶ 5; ECF No. 35-1 at 2, 9, ¶¶ 1, 22 & n.1.)  Klein also decided that employees in the Colorado state office's "Branch of Fluid Minerals" were likely to have responsive records, "because the decision to offer parcels for leasing Colorado is made in the State Office."  (ECF No. 35 at 3, ¶ 6.)  Klein forwarded the FOIA request those two units' respective FOIA coordinators.  (*Id.* at 4, ¶ 7.)

**B.    Original Search**

1.    <u>Tres Rios</u>

The FOIA coordinator in the Tres Rios Field Office was Connie Clementson.  (*Id.* ¶ 8.)  She identified herself and Ryan Joyner (team lead for the March 2018 lease sale) as persons likely to have responsive records.  (*Id.* ¶¶ 8, 11.)  Joyner then assumed responsibility for coordinating the office's response because his team lead status also made him responsible for organizing and maintaining the official decision file for the project, thus giving him the most knowledge regarding the documents and employees involved.  (*Id.* at 4–5, ¶¶ 12–13.)

Joyner first identified the entirety of a "shared folder" relating to the March 2018 lease sale as responsive.  (*Id.* at 5, ¶¶ 15–16.)  Tres Rios employees had been trained to use this shared folder as the repository for all documents and communications related to the lease sale, and in fact saved documents there on a regular basis.  (*Id.* ¶¶ 17–18.)

Joyner then searched his own e-mail and hard copy records, but he does not remember whether these searches yielded anything that was not already in the shared folder.  (*Id.* at 5–6, ¶¶ 21–22.)

Joyner next spoke with members of the leasing team to request that they place responsive documents into the shared folder, if they had not already.  (*Id.* at 6–7 ¶¶ 27, 32–33.)  In particular, he specifically recalls making this request to three team members, and he believes (based on his "standard practice") that he made the same request to three additional team members.  (*Id.* ¶¶ 32–33.)

Everyone who searched looked for records in existence as of the time of the search—or in other words, no one cut off their search as of the date of the FOIA request

(October 19, 2017).  (*Id.* ¶ 34.)  All searches were complete on or before November 3, 2017, which is the day that responsive records were sent to BLM's Colorado state office.  (*Id.* at 8, ¶ 35.)

2.    Branch of Fluid Minerals

The FOIA coordinator in the Branch of Fluid Minerals was Peter Cowan.  (*Id.* ¶ 36.)  He identified himself and six others in his office as individuals likely to have responsive records "because they comprised the state office leasing team."  (*Id.*)  Cowan also forwarded the FOIA request to Dana Wilson, Acting District Manager for BLM's Colorado Southwest District, based in Montrose, Colorado.  (*Id.* ¶ 37; ECF No. 39-1 ¶ 8.)

The Branch of Fluid Minerals team lead for the March 2018 lease sale was Rebecca Baca.  (ECF No. 35 at 8, ¶ 40.)  Baca identified a "centralized file dedicated to the March 2018 lease sale" as containing "the majority of responsive documents."  (*Id.* at 9, ¶ 41.)  Baca designated that file as responsive.  (*Id.* ¶ 43.)  Baca also "maintained an 'unofficial correspondence' folder, which included [e-mail] communications about the lease sale among members of the lease sale team or with the Tres Rios Field Office."  (*Id.* ¶¶ 44, 46.)  Baca designated this e-mail folder as responsive.  (*Id.* ¶ 46.)  She also searched the rest of her e-mails "using the words: March 2018 oil & gas lease sale."  (*Id.*)  Everyone else on the team was asked to search his or her e-mails "in a similar manner."  (*Id.* ¶ 47.)  And if the team member maintained a dedicated e-mail folder for the March 2018 lease sale, he or she was asked to designate that folder as responsive.  (*Id.* at 9–10, ¶¶ 48–49.)  Team members were also asked to search in personal hard-copy or electronic filing systems.  (*Id.* at 10, ¶ 50.)

As in the Tres Rios Field Office, everyone who searched looked for records in

existence as of the time of the search, rather than records in existence as of the date of the FOIA request. (*Id.* ¶ 52.) And, like the Tres Rios Field Office, all searches were complete on or before November 3, 2017, on which date responsive materials were sent to Klein, the FOIA Officer. (*Id.* ¶¶ 54–55.)

## C.  Original Production & Commencement of this Lawsuit

Having received the various documents discovered by relevant employees, Klein "worked with BLM staff and the Regional Solicitor's Office to ensure that all information was reviewed line by line in accordance with the requirements of the FOIA and [the Department of the Interior's] FOIA regulations." (*Id.* at 11, ¶ 56.) BLM produced an initial installment of 140 pages (no redactions) on December 5, 2017, and a second installment of 1,595 pages (also no redactions) on December 28, 2017. (*Id.* ¶ 59.)

Rocky Mountain Wild filed this lawsuit on February 8, 2018. (ECF No. 1.) Rocky Mountain Wild alleged, among other things, that BLM failed to conduct a lawful search for responsive records, and that BLM continued to violate FOIA by withholding responsive records through improper exemptions. (*Id.* ¶¶ 34–35.)

BLM produced its third and final installment of documents on March 6, 2018. (ECF No. 35 at 11, ¶ 61.) This production comprised 346 pages, of which 97 contained redactions pursuant to certain FOIA exemptions. (*Id.*) The transmittal cover letter also announced that BLM was withholding 63 pages in full pursuant to certain FOIA exemptions. (ECF No. 35-1 at 50.) The letter went on to explain the exemptions invoked and the reasons for invoking them. (*Id.* at 50–53.)

With the Court's leave, Rocky Mountain Wild filed an amended complaint on April 3, 2018 (ECF No. 12-1), which remains the operative complaint. The amended complaint continues to allege that BLM failed to conduct a lawful search for responsive

records, and is withholding responsive records through improper exemptions. (*Id.* ¶¶ 36–38.)

## D.    Pre-Summary Judgment Negotiations

In January 2019, the Court entered an order dismissing Rocky Mountain Wild's claims *other than* its claim that BLM has failed to fully and properly respond to the October 19, 2017 FOIA request. *Rocky Mountain Wild v. BLM*, 2019 WL 233329, at *7 (D. Colo. Jan. 16, 2019) (ECF No. 20). "[C]onsidering the relatively narrow scope of the remaining dispute," the Court "strongly encouraged [the parties] to consider the utility of requesting a settlement conference before the Magistrate Judge." *Id.* at *7.

Apparently in the spirit of that admonition, BLM, on April 5, 2019, provided Rocky Mountain Wild "with a pre-summary judgment search declaration and *Vaughn* Index[3] explaining the actions the BLM had taken to search its records in response to [the] FOIA request and the bases for the BLM's withholdings." (ECF No. 35 at 12, ¶ 65.) While preparing the *Vaughn* Index, BLM determined that it no longer needed to withhold certain documents it had been withholding, because the March 2018 lease sale was now a year in the past and so the justifications for withholding pre-decisional materials were substantially lessened. (*Id.* at 12–13, ¶¶ 66–69.)

Rocky Mountain Wild responded by letter dated April 26, 2019. (ECF No. 36-10.) Rocky Mountain Wild announced its position "that a new search must be carried out." (*Id.* at 1.) This was so for three principal reasons:

- BLM had not contemporaneously documented its search efforts and so was forced to rely on "stale memories and agency guesses" about who

---

[3] A *Vaughn* index is the FOIA equivalent of a privilege log. *See Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974).

searched for what and where (*id.* at 1–2);

- the records thus far disclosed revealed numerous names of persons who had not been asked to search for documents (*id.* at 2–4); and

- the persons who searched through their e-mails did so with inconsistent search terms (*id.* at 5).

Rocky Mountain Wild also insisted that any new search encompass records up through at least April 22, 2019 (rather than through the cutoff date of the original search, November 3, 2017). (*Id.*)

## E.    Supplemental Search

BLM disagreed with Rocky Mountain Wild's letter, and BLM "determined" (through an unspecified process) that its original search had been proper and thorough. (ECF No. 35 at 13–14, ¶¶ 73–80.) "Nonetheless," BLM "elected to seek to assuage [Rocky Mountain Wild's] concerns about the original search by designing a supplemental search." (*Id.* at 14, ¶ 81.)

By this time, Klein had moved on from his position as FOIA Officer for BLM's Colorado state office, and Garcia-Hinojosa had succeeded him. (ECF No. 35-1 at 2, ¶ 1.) Garcia-Hinojosa and Cowan (the FOIA coordinator for the Branch of Fluid Minerals) worked together to create a list of search terms "reasonably likely to identify all responsive records." (ECF No. 35 at 14, ¶ 82.) Garcia-Hinojosa and Cowan were "well-positioned to identify [the appropriate] search terms" because Cowan had "extensive familiarity with the March 2018 lease sale" and Garcia-Hinojosa had "reviewed the thousands of pages that were previously identified and produced," making her "familiar with the words and phrases used in [those] communications." (*Id.* at 15, ¶¶ 83–85.) They eventually created a list of thirteen search terms, including the

numbers of all of the Proposed Parcels and various other terms that had been used to refer to the March 2018 lease sale.  (*Id.* ¶ 88.)

Garcia-Hinojosa then reviewed Rocky Mountain Wild's proposed list of persons who should be asked to search for documents.  (*Id.* ¶ 92.)  She believed that most of these persons would be unlikely to have responsive records, but she directed all of them—a total of twenty-eight, inclusive of persons who had already searched—to conduct a search, "in an abundance of caution and in an effort to reach a compromise." (*Id.* at 16–17, ¶¶ 93–95.)  Garcia-Hinojosa also identified one additional person, not on Rocky Mountain Wild's list, that she believed should participate in the search.  (*Id.* at 17–18, ¶¶ 96–97.)

As she sent out her new search requests, Garcia-Hinojosa learned that seven of the persons on her new list no longer worked for BLM.  (*Id.* at 18, ¶ 98.)  She therefore directed the appropriate Department of the Interior information technology office to search those persons' archived e-mail.  (*Id.* ¶ 99.)

Garcia-Hinojosa specified that all searches, whether by the employee through his or her own documents or by the IT department through former employees' e-mails, should be directed at documents dated or created between January 1, 2017 (a little before BLM began working on the March 2018 lease sale) and November 3, 2017 (the original search cutoff date).  (*Id.* at 18–19, ¶¶ 99–106.)

F.    **Supplemental Production**

Garcia-Hinojosa reviewed the documents discovered through the supplemental search.  (*Id.* at 19, ¶¶ 107–08.)  She found that "they were almost entirely duplicative of the documents that had already been produced."  (*Id.* ¶ 108.)  The searches also "returned a number of documents that bore no relation to the March 2018 lease sale

and were not responsive to the request."  (*Id.* ¶ 109.)

Garcia-Hinojosa finally identified 320 pages that were arguably responsive to Rocky Mountain Wild's request.  (*Id.* at 20, ¶ 110.)  "The majority of these pages consist of email chains relating to the scheduling of meetings and conference calls addressing a wide number of subjects (not just the March 2018 lease sale), meeting agendas, 'out of office' emails, and other non-substantive exchanges."  (*Id.* ¶ 111.)  Many of the 320 pages are duplicates of each other, such as e-mail chains produced by more than one person.  (*Id.* ¶ 113.)  Some of the pages duplicated what BLM had previously produced, but Garcia-Hinojosa decided not to exclude them from this supplemental production because "there were cover transmittal emails that were not previously identified."  (*Id.* ¶ 114.)

Garcia-Hinojosa then reviewed the 320 pages line-by-line to determine if any FOIA exemptions would apply.  (*Id.* ¶ 117.)  She concluded that 27 pages should be redacted and 76 pages should be withheld in full.  (*Id.* ¶ 120.)

At some point before BLM filed its summary judgment motion, it produced to Rocky Mountain Wild the documents it found throughout supplemental search, minus the pages it chose to withhold.  BLM also filed a *Vaughn* Index as an exhibit to its summary judgment motion.  (ECF No. 35-2.)

### III.  ANALYSIS

No party argues that the Court should evaluate whether BLM's original search, standing alone, complied with FOIA.  The Court will therefore evaluate whether the original search and supplemental search, together, satisfied BLM's FOIA duties.  The Court therefore will evaluate BLM's combined efforts as between the two searches.

## A.     Scope of Search

The parties' major dispute is whether BLM searched thoroughly enough for responsive records.

### 1.     Duty of Liberal Construction

Many of Rocky Mountain Wild's challenges to the scope of BLM's search rely on the premise that BLM had a duty to construe the FOIA request more broadly than it did.

A FOIA requester must "reasonably describe[]" the records sought, 5 U.S.C. § 552(a)(3)(A)(I), and the responding agency "may appropriately refrain from disclosing" materials that are "outside the scope of [the] request," *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1233 n.6 (10th Cir. 2007) ("*Trentadue-IC*").  Nonetheless, Congress enacted the "reasonably describes" language specifically to replace a prior statutory standard ("request for identifiable records") that agencies had been using to justify withholding records not requested with specificity.  *Truitt v. Dep't of State*, 897 F.2d 540, 544 & nn.26–27 (D.C. Cir. 1990).  "Reasonably describes" was therefore intended to "'make[] explicit the liberal standard for identification that Congress intended.'"  *Id.* at 545 (quoting relevant Senate report).  In short, "an agency . . . has a duty to construe a FOIA request liberally."  *Nation Magazine, Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995).  Nonetheless, "an agency processing a FOIA request is not required to divine a requester's intent."  *Landmark Legal Found. v. EPA*, 272 F. Supp. 2d 59, 64 (D.D.C. 2003).

Just how far the construe-liberally rule extends is unclear.  *Compare Gov't Accountability Project v. U.S. Dep't of Homeland Sec.*, 335 F. Supp. 3d 7, 12 (D.D.C. 2018) ("FOIA requests are not a game of Battleship.  The requester should not have to score a direct hit on the records sought based on the precise phrasing of his request.")

*with Bloeser v. U.S. Dep't of Justice*, 811 F. Supp. 2d 316, 321 (D.D.C. 2011) ("Because FOIA was not intended to reduce government agencies to full-time investigators on behalf of requesters, it is the requester's responsibility to frame requests with sufficient particularity to enable the searching agency to determine precisely what records are being requested." (internal quotation marks and citations omitted; alterations incorporated)). Part of the tension between liberal construction and reasonable specificity is that a FOIA requester who is dissatisfied with the scope of the agency's search can always submit a new request targeted at those keywords, date ranges, etc., that the requester learned—through litigation—were not part of the original search. (*See* ECF No. 36 at 29 (Rocky Mountain Wild's admission that it "could have obviously filed a new FOIA request to obtain" records it believes may exist).) Thus, such requesters have an immediate remedy outside of litigation. On the other hand, agencies may not turn the FOIA process into a game.

Nonetheless, in cases where a court has held that the government agency failed to construe the request liberally, the agency's stinginess is usually rather obvious. *See, e.g.*, *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 373 F. Supp. 3d 120, 124–25 (D.D.C. 2019) (when asked for certain records regarding Special Counsel Robert Mueller's investigation into Russian interference with the 2016 presidential election, agency searched its electronic records only for the term "special counsel," not "Mueller," reasoning that "any document containing 'Mueller' was reasonably likely to also include 'special counsel'"); *Gov't Accountability Project*, 335 F. Supp. 3d at 9, 11 (when asked to search for records "relat[ing] to 'ideological tests' and 'searches of cellphones' at the U.S. border," the agency searched its electronic records only for those phrases, essentially verbatim, to the exclusion of obvious synonyms such as "cell phone" and

"phone"); *Bagwell v. U.S. Dep't of Justice*, 311 F. Supp. 3d 223, 229–30 (D.D.C. 2018) (when asked to search for records about Pennsylvania State University, agency only searched for the university's full name, and not common nicknames like "PSU" or "Penn State").

With these principles in mind, the Court turns to Rocky Mountain Wild's specific arguments about the scope of BLM's search.

      2.    <u>No Washington, D.C., Office Employees Asked to Search</u>

Rocky Mountain Wild offers four reasons why BLM should have expanded its search to include persons in its Washington, D.C., office who might have responsive records.

      a.    *October 19, 2017 E-Mail (Parcel 7387)*

On October 19, 2017, BLM employee Suzanne Mehlhoff (role and location unknown) e-mailed BLM employee Jayson Barangan (same), copying BLM employees Steven Hall (same), Peter Cowan (in the Branch of Fluid Minerals, Colorado office), and John D. Beck (role and location unknown). (ECF No. 36-8.) The e-mail begins, "Attached is a rough stab at a briefing document for WO on the parcel in the March 2018 oil and gas lease sale." (*Id.*) The reference to "the parcel" is to parcel 7387, which is not among the Proposed Parcels. (*Id.* (noting attachment titled "TRFO_Parcel 7387 BP_2017.10.18_DRAFT v2.docx").)

Rocky Mountain Wild asserts, and BLM does not contest, that "WO" in this e-mail means "Washington Office." (ECF No. 36 at 15, ¶ B.) BLM emphasizes, however, that parcel 7387 "was not offered in March 2018 and was not identified in [Rocky Mountain Wild's] FOIA request." (ECF No. 38 at 11, ¶ B.)

BLM is correct that parcel 7387 is not among those about which Rocky Mountain

Wild requested information.  But more importantly, Rocky Mountain Wild has pointed the Court to nothing in the record showing that any briefing document was actually sent to the Washington office.  Thus, nothing about this e-mail necessarily should have prompted BLM to consider asking Washington office employees to search for responsive records.

To the extent Rocky Mountain Wild argues that BLM should have construed the FOIA request liberally to include all parcels considered for leasing in March 2018 (such as parcel 7387), and not just those parcels listed in the FOIA request, the Court will address that argument in Part III.A.3.b, below, in the context of an argument that BLM should have expanded its search terms.

b.     *March 6–8, 2017 E-Mail Chain*

On March 6, 2017, Rachel Vaughn (a land law examiner in BLM's Colorado office) sent an e-mail to BLM employees Jully McQuilliams (role and location unknown) and Jennifer Spencer (same), copying BLM employees Sean Hudak (in the Colorado office, role unknown), Rebecca Skinner (role and location unknown), Cheryl Hirschel (in the Colorado office, role unknown), and Peter Cowan (in the Branch of Fluid Minerals, Colorado office).[4]  (ECF No. 36-9 at 1.)  It is not clear what prompted Vaughn's e-mail.  It begins, "It doesn't look like Colorado will have a March 2018 Lease Sale."  (*Id.*)  Vaughn then asks for guidance about what type of memorandum to send "to WO," apparently referring to a memorandum explaining Colorado BLM's decision not to have a March 2018 lease sale.  (*Id.*)

On March 8, 2017, Jennifer Spencer replied to Vaughn's e-mail, stating, "We've

_____

[4] Vaughn, Hudak, Hirschel, and Cowan were among those who searched for responsive records.  (ECF No. 35 at 17, ¶ 95.)

been seeing some push back from the Main Interior [office], regarding lease sale postponements since we received the WEA litigation." (*Id.* at 2.)[5]  Spencer asked Vaughn to consider "mov[ing] some parcels currently scheduled for your December 2017 lease sale, so your office could continue to hold a March 2018 lease sale," but otherwise provided Vaughn a template to use, apparently (again) referring to a template for a memorandum explaining Colorado BLM's decision not to have a March 2018 lease sale.  (*Id.*)

Later that day, Jully McQuilliams replied on the same e-mail thread to "echo what Jennifer [Spencer] said" and provide additional suggestions for finding parcels that could be offered for sale in March 2018.  (*Id.* at 3.)

Nothing in this e-mail thread, or anything else in the record of which the Court is aware, establishes that any of the participants on this e-mail thread were Washington office employees.  In addition, this thread at most shows the Washington office's generalized interest in holding lease sales.  Rocky Mountain Wild asked for "all agency records created or obtained for the purpose of preparing and implementing the March 2018 offering of lease sale parcels 7981, 7982, 7983, 7984, 7985, 7986 and 7987." (ECF No. 35-1 at 35.)  Whatever duty of liberal construction might apply to this request, it does not require the Colorado BLM office (to whom the FOIA request was submitted) to assume that what the requester really wants is all records relating to BLM's decision to hold any lease sale, anytime, anywhere.  Thus, nothing about this e-mail exchange required BLM to expand its search scope to include the Washington office.

---

[5] No party explains what the "WEA litigation" is.  In 2016, however, Western Energy Alliance sued BLM in the United States District Court for the District of New Mexico, claiming that BLM was violating a statutory duty to hold lease sales at least quarterly.  *See W. Energy All. v. Jewell*, 2017 WL 3600740, at *1 (D.N.M. Jan. 13, 2017).

c.    *Jim Scrivner*

On June 15, 2017, Jim Scrivner (in the Energy and Minerals Task Force, Washington office), e-mailed BLM employees Brian St. George (natural resources specialist, Colorado office) and Theresa Hanley (role and location unknown).  (ECF No. 36-5 at 13.)[6]  Scrivner stated that

> BLM and Department leadership are very interested in a number of energy-related items.  One thing we are trying to be sure is understood is the full landscape of energy-related [resource management plans], [environmental impact statements], and [environmental assessments].  Attached is a set of four tables showing what we believe to be the case for your State.  Our [request] is that you validate the items and remove those that are there in error, correct errors of fact in those that should remain, and add those that are missing.

(*Id.*)  Scrivner's e-mail and accompanying tables were then forwarded to various persons working for BLM in Colorado.  (*See id.* at 12–24.)  This ultimately resulted in a chart that was returned to the Washington office on June 20, 2017.  (*Id.* at 21.)  The chart included, among many other things, a line for the "March 2018 Competitive Oil and Gas Lease Sale" showing "Major Milestone Dates."  (*Id.* at 26.)

Under the circumstances, the Washington office's request that the Colorado office fill out a chart showing all of the office's current projects (the March 2018 lease sale being one among many) did not trigger any duty to search the Washington office for records responsive to Rocky Mountain Wild's FOIA request.  Colorado BLM could reasonably conclude that this interaction with the Washington office did not give rise to a realistic possibility that the Washington office would have responsive records.

---

[6] St. George was among those who searched for responsive records.  (ECF No. 35 at 17, ¶ 95.)

        d.    *Dana Wilson*

At the time BLM was processing Rocky Mountain Wild's FOIA request, Dana Wilson was Acting District Manager for BLM's Colorado Southwest District, based in Montrose.  (*See* Part II.B.2, above.)  Wilson was on Garcia-Hinojosa's list of persons to participate in the supplemental search, and was one of the agency's employees who had left BLM's employ by the time Garcia-Hinojosa sent out her supplemental search requests.  (*See* ECF No. 35 at 17–18, ¶¶ 95, 98; *see also* Part II.E, above.)  Therefore, Wilson's archived e-mail was searched by Department of Interior IT personnel.  (ECF No. 35 at 18, ¶ 99.)

Rocky Mountain Wild asserts that Wilson was an employee in the Washington office.  (ECF No. 37 at 4, ¶ 11.)  Rocky Mountain Wild does not explain why it believes Wilson worked in the Washington office, and this appears to be a simple mistake.  There is nothing about Wilson's involvement that should have prompted BLM to search the Washington office.

        3.    <u>Search Terms</u>

The search terms that Cowan and Garcia-Hinojosa developed for the supplemental search were the following:

    1. 7981

    2. 7982

    3. 7983

    4. 7984

    5. 7985

    6. 7986

    7. 7987

8. March 2018 Lease Sale

9. Tres Rios Lease Sale

10. "lease sale" and "March"

11. March 2018

12. TRFO lease sale

13. March sale

(ECF No. 35 at 15, ¶ 88.)  As noted above (Part II.E), Cowan and Garcia-Hinojosa

developed the search terms through Cowan's first-hand experience with the lease sale

itself and Garcia-Hinojosa's first-hand experience with the many documents BLM had

already produced by the time it decided to perform a supplemental search.

The agency's choice of search terms, like its search generally, will generally be

upheld if it is reasonable:

> There is no bright-line rule requiring agencies to use the
> search terms proposed by a plaintiff.  Defendants have
> discretion in crafting a list of search terms that they believe
> to be reasonably tailored to uncover documents responsive
> to the FOIA request.  Where the search terms are
> reasonably calculated to lead to responsive documents, the
> Court should not micro manage the agency's search.

*Liberation Newspaper v. U.S. Dep't of State*, 80 F. Supp. 3d 137, 146 (D.D.C. 2015)

(internal quotation marks and citations omitted; alterations incorporated).

    a.  *Sage-Grouse and ACEC*

Rocky Mountain Wild asserts that the supplemental search terms were unduly

narrow because they did not include "Gunnison sage-grouse" or "ACEC (Area of Critical

Environmental Concern," both of which are mentioned in Rocky Mountain Wild's FOIA

request (*see* Part II.A, above).  (ECF No. 36 at 24–25.)  Here, however, the context in

which Rocky Mountain Wild mentioned "Gunnison sage-grouse" and "ACEC" matters

greatly. Again, the FOIA request itself sought "all agency records created or obtained for the purpose of preparing and implementing the March 2018 offering of lease sale parcels 7981, 7982, 7983, 7984, 7985, 7986 and 7987." (ECF No. 35-1 at 35.) In the paragraph *following* this request, Rocky Mountain Wild explained that "[t]he request is time sensitive due to ongoing agency decisionmaking and because these parcels, if leased and developed, have the potential to negatively impact the Endangered Species Act listed Gunnison sage-grouse and values within an ACEC." (*Id.*)

In this light, the Court is unpersuaded that BLM was unreasonable in failing to include "Gunnison sage-grouse," "ACEC," or variants in its search terms. Indeed, it stands to reason that searching for these terms without also searching for one or more of the terms listed above would have been vastly overinclusive.[7]

b.    *Parcels Not Among the Proposed Parcels*

Rocky Mountain Wild next asserts that the supplemental search terms were unduly narrow because they did not include the parcel numbers for four parcels that were considered by BLM for leasing in March 2018 but were not among the Proposed Parcels (and therefore not listed in Rocky Mountain Wild's FOIA request). (*See* ECF No. 36 at 25–26.) This arguments rests on the notion that BLM had a duty to construe Rocky Mountain Wild's FOIA request more broadly than a request for only information on the Proposed Parcels.

On this issue, the Court agrees with Rocky Mountain Wild. Admittedly, this is not

---

[7] According to the latest data from BLM, there are eighty-eight ACECs in Colorado. *See* https://www.blm.gov/sites/blm.gov/files/planningandnepa_aceclist.xlsx (last accessed March 17, 2020). And a simple search of the Federal Register shows that Colorado BLM frequently considers the Gunnison sage-grouse. *See, e.g.*, 79 Fed. Reg. 42033 (July 18, 2014) (beginning the process of "incorporat[ing] Gunnison Sage-Grouse Conservation Measures into Resource Management Plans").

the sort of obvious stinginess evident in the cases surveyed above (Part III.A.1).

However, in the context of the FOIA request as a whole, the Court finds that Rocky

Mountain Wild's enumeration of specific parcels should have been liberally construed to

reach all of the parcels considered for the March 2018 lease sale. There is no

reasonable basis to think that Rocky Mountain Wild was genuinely interested in only a

subset of parcels considered for that lease sale, to the exclusion of any others. Rather,

Rocky Mountain Wild made plain its interest in the effect that the March 2018 lease

sale—and not just a portion of that lease sale—may have on Gunnison sage-grouse

and ACECs in the proposed lease sale area. Accordingly, the Court finds that BLM's

search was deficient to the extent BLM excluded documents about parcels considered

for the March 2018 lease sale but not listed in Rocky Mountain Wild's FOIA request.[8]

BLM is not entitled to summary judgment on this aspect of the case.

c.     *Overinclusive Search Results*

Rocky Mountain Wild's final argument regarding search terms is somewhat

difficult to understand. Rocky Mountain Wild first quotes Garcia-Hinojosa's report in her

declaration that the supplemental search terms "'returned a number of documents that

bore no relation to the March 2018 lease sale.'" (ECF No. 36 at 26 (quoting ECF No.

35-1 at 28–29, ¶ 81).) Rocky Mountain Wild then argues that BLM should have used

more sophisticated search terms to avoid this overinclusivity problem. (*Id.* at 26–27.)

This is *post hoc* advice, not an argument that BLM failed to conduct a search.

BLM carried out a search using overinclusive terms and Garcia-Hinojosa then

personally reviewed "every document identified" for responsiveness. (ECF No. 35-1

_____

[8] Rocky Mountain Wild says that the parcels at issue are 6434, 7387, 7980, and 7989.
(ECF No. 36 at 25.)

at 29, ¶ 82.)  In other words, BLM went about it the hard way, but it went about it nonetheless.  It would be nonsensical to hold that BLM's search was unreasonable because it could have reached the same destination more easily.  Rocky Mountain Wild's argument in this regard is meritless.[9]

### 4. Cutoff Date for Supplemental Search

BLM's supplemental search took place in 2019, but was limited to documents in existence as of November 3, 2017.  (*See* ECF No. 35 at 16–19, ¶¶ 94, 105–06.) November 3, 2017 was the cutoff date of the original search, so BLM's choice to use that cutoff date for the supplemental search was essentially a choice to recreate the original search with standardized search terms and additional potential custodians.

Rocky Mountain Wild argues that November 3, 2017 "may have been a reasonable cutoff date originally, [but] it was not reasonable for a new search conducted in June, 2019."  (ECF No. 36 at 30.)  Rocky Mountain Wild acknowledges that it "could have obviously filed a new FOIA request to obtain records created after November 3, 2017," but its April 26, 2019 letter to BLM asserted that the supplemental search should run through at least April 22, 2019.  (*Id.* at 29; *see also* ECF No. 36-10 at 5.)  Thus, says Rocky Mountain Wild, it did not file a new FOIA request "in reliance upon the BLM's good faith efforts to resolve this case and comply with FOIA, believ[ing] the agency would conduct a new search with the intent of complying with the FOIA."  (ECF No. 36 at 29.)

---

[9] Rocky Mountain Wild's response to BLM's statement of material facts and Rocky Mountain Wild's statement of additional disputed facts, as well as its "Statement of Fact" in its own cross-motion, all include assertions about persons (not addressed above) who did not search for documents, and types of documents (not addressed above) for which BLM did not search.  (*See* ECF No. 36 at 3–19; ECF No. 37 at 2–7.)  However, Rocky Mountain Wild never argues that these assertions create deficiencies requiring BLM to redo its search.  (*See* ECF No. 36 at 22–30; ECF No. 37 at 7–13.)  The Court therefore ignores these claims.

Other than generally being open to a supplemental search, Rocky Mountain Wild does not describe what BLM did to cause Rocky Mountain Wild to conclude that it could rely on BLM to expand that search through April 22, 2019. To the contrary, Rocky Mountain Wild goes on to say that its counsel and BLM's counsel had a telephone conference in May 2019, during which BLM's counsel announced that BLM would conduct a supplemental search using the November 3, 2017 cutoff date. (*Id.* at 29–30.) Rocky Mountain Wild's counsel "opposed" that plan but "agreed to defer briefing in the hopes that the agency would comply with FOIA through this new search and a settlement could be reached." (*Id.* at 30.) In other words, Rocky Mountain Wild knew that BLM had *expressly rejected* the idea of looking for documents generated later than November 3, 2017, but Rocky Mountain Wild simply hoped that BLM would change its mind. There was therefore manifestly no reliance, reasonable or otherwise. Even if there had been reliance, Rocky Mountain Wild can still submit a new FOIA request.

Moreover, there is reason in this instance not to require BLM to search with a broader temporal scope. BLM's original response to the FOIA request was fairly rapid as these things go. It received the request on October 19, 2017, it completed its searches on November 3, 2017, and it released responsive records on December 5, 2017 (140 pages), December 28, 2017 (1,595 pages), and March 6, 2018 (346 pages). (*See* Part II.C, above.) In other words, it appears that BLM took seriously Rocky Mountain Wild's claim that its request was "time sensitive due to ongoing agency decisionmaking" about the Proposed Parcels. (ECF No. 35-1 at 35.)

Now Rocky Mountain Wild is insisting that BLM must search for documents that did not yet exist when BLM was doing its best to carry out the original search. Moreover, the only reason Rocky Mountain Wild can make this argument is because

BLM, in a gesture of compromise regarding alleged deficiencies in the original search, agreed to conduct a supplemental search. If the Court were to hold in these circumstances that an agreement to conduct a supplemental search obligates the agency to expand the temporal scope of the search vastly beyond the original temporal scope, agencies would have little incentive to pursue the compromise that BLM pursued in this case. Such a result would not be in the public interest.

Perhaps there are circumstances when a FOIA requester can rightfully demand a supplemental search with a temporal scope broader than the requester could have expected from a diligently-pursued original search. Whatever those circumstances may be, Rocky Mountain Wild has not shown that they exist here. The Court accordingly finds that BLM's November 3, 2017 cutoff date was reasonable under the circumstances.

## B.     Exemptions

In the aggregate, BLM redacted 124 pages and withheld 139 pages. (*See* Parts II.C & II.F, above.) Its *Vaughn* Index asserts that these withholdings are variously justified under FOIA Exemptions 3, 5, and 6 (*i.e.*, 5 U.S.C. § 552(b)(3), (5), and (6)). BLM argues that all of its exemptions were justified. Rocky Mountain Wild pushes back only on Exemptions 5 and 6. (*See* ECF No. 36 at 31–33.) The Court will therefore address Exemptions 5 and 6 only, deeming Rocky Mountain Wild to concede that BLM's Exemption 3 withholdings were proper.[10]

---

[10] Exemption 3 applies to matters "specifically exempted from disclosure by statute." 5 U.S.C. § 552(b)(3). BLM withheld a number of communications with Native American tribes because disclosing those communications could disclose the location of sensitive archaeological resources, in violation of the Archaeological Resources Protection Act. *See* 16 U.S.C. § 470hh(a).

1. <u>Exemption 5</u>

Exemption 5 applies to "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). "In other words, it protects documents that would be covered by any privilege that an agency could assert in a civil proceeding." *Trentadue-IC*, 501 F.3d at 1226.

a. *Deliberative Process & Attorney-Client Privileges*

Exemption 5 encompasses the attorney-client privilege and the attorney work-product protection. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 154 (1975). In a federal agency, an attorney-client privilege can arise between an agency attorney and an employee of the same agency seeking advice from the attorney in his or her capacity as an agency attorney. *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862–63 (D.C. Cir. 1980).

Exemption 5 also encompasses the deliberative process privilege, which "covers documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (internal quotation marks omitted).

Rocky Mountain Wild asserts that the *Vaughn* Index does not provide enough information to support these claimed exemptions because "there is no indication whether any person[] for whom Exemption 5 is asserted is within a protected group of decisionmakers, an attorney providing legal advice, or an employee receiving legal advice." (ECF No. 36 at 32.) It appears that that phrase "protected decisionmakers" is a reference to the deliberative process privilege, and is meant to imply that the privilege

extends only to certain agency employees. Rocky Mountain Wild cites no authority for the proposition that the deliberative process privilege is employee-specific, rather than record-specific. Nor is the Court aware of any such authority. *Cf. Trentadue-IC*, 501 F.3d at 1226–27 (explaining the scope of the deliberative process privilege in terms of types of documents, not types of agency employees). The Court therefore rejects this argument.

As for the alleged failure to "indicat[e] whether any person[] for whom Exemption 5 is asserted is . . . an attorney providing legal advice, or an employee receiving legal advice" (ECF No. 36 at 32), the *Vaughn* Index shows otherwise. BLM invoked the attorney-client privilege to withhold four documents, which the *Vaughn* Index, in pertinent part, describes as follows:

| Subject of Email / Subject Matter or Title of Document | Document Date | From/To | Description of Withheld Material and Explanation for Withholding |
|---|---|---|---|
| Re: March 2018 Lease sale DNA- Post SO review | 9/5/2017 | From Danielle Di[M]auro to Barbara Sterling cc | Redacted information is protected by the Attorney-Client privilege, as it reflects an exchange between BLM employee and Office of the Regional Solicitor attorney relating to the attorney's review of Determination of NEPA Adequacy, made in the course of giving and receiving legal advice. |

| Subject of Email / Subject Matter or Title of Document | Document Date | From/To | Description of Withheld Material and Explanation for Withholding |
|---|---|---|---|
| Re: March 2018 Lease sale DNA- Post SO review | 9/5/2017 | From Danielle Di[M]auro to Barbara Sterling | This document is a Draft Determination of NEPA Adequacy which contains confidential, substantive edits and comments throughout the draft made by the BLM's attorney in the Department of the Interior Solicitor's Office. These edits and comments were made by the attorney in the course of the parties' attorney-client relationship and for the purpose of giving and receiving legal advice. The release or disclosure of this information would breach the attorney-client privilege and would likely hinder the adversarial trial process and/or interfere with BLM's legal representation. |
| Response to Public Comment Review for March 2018 O&G Lease Sale DNA | 11/3/2017 | From George San Miguel to Danielle DiMauro | Redacted information contains an exchange between BLM employee and Office of the Regional Solicitor attorney relating to the attorney's review of revised Determination of NEPA Adequacy and draft responses to public comments, made in the course of giving and receiving legal advice. |
| Response to Public Comment Review for March 2018 O&G Lease Sale DNA | 11/3/2017 | From Danielle DiMauro to George San Miguel cc Barb Sterling | Redacted information contains an exchange between BLM employee and Office of the Regional Solicitor attorney relating to the attorney's review of revised Determination of NEPA Adequacy and draft responses to public comments, made in the course of giving and receiving legal advice. |

(ECF No. 35-2 at 5–6, 13.)

Rocky Mountain Wild provides no reason to believe that Danielle DiMauro was not an attorney in the Office of the Regional Solicitor, nor any reason to believe that the other persons named were not BLM employees.[11] The Court therefore rejects Rocky

---

[11] Rocky Mountain Wild does not contest that Barbara Sterling and George San Miguel were employees in the Branch of Fluid Minerals, and were among those directed to search for documents. (*See* ECF No. 35 at 8, ¶ 39.)

Mountain Wild's argument in this regard.

Finally, Rocky Mountain Wild cites a decision from the United States District Court for the Northern District of Oklahoma finding that a "briefing paper" about a decision to take Indian lands into trust could not be withheld under the attorney-client privilege because, among many other reasons, "one would expect some indication on the briefing paper itself or in the transmitting email that the content was subject to the attorney client privilege if, in fact, it was." *Cherokee Nation v. Salazar*, 986 F. Supp. 2d 1239, 1249 (N.D. Okla. 2013). Rocky Mountain Wild finds it significant that BLM fails to say whether the documents withheld under the attorney-client privilege had any such indication. (ECF No. 36 at 32–33.)

Rocky Mountain Wild treats *Cherokee Nation* as if expounding a general principle of law, as opposed to deciding an issue on the specific facts of that case. *Cherokee Nation* was doing the latter, not the former, as evidenced by the fact that the decision cites nothing to support its reasoning in this regard, and it includes this fact as one among many supporting the lack of attorney-client privilege.

There may be situations—as in *Cherokee Nation*—where the lack of an explicit claim to attorney-client privilege on the relevant document is significant. Rocky Mountain Wild has given the Court no reason to believe that this case falls into that category. The Court therefore rejects this argument as well.

In short, BLM has appropriately invoked the deliberative process and attorney-client privileges.

b.    *Commercial Information Privilege*

The Supreme Court has endorsed "a limited privilege for confidential commercial information pertaining to [government] contracts," *Fed. Open Mkt. Comm. of Fed.*

*Reserve Sys. v. Merrill*, 443 U.S. 340, 359 (1979), which the First Circuit has extended to "protect[ing] the government when it enters the marketplace as an ordinary commercial buyer or seller," *Gov't Land Bank v. Gen. Servs. Admin.*, 671 F.2d 663, 665 (1st Cir. 1982). Under this authority, BLM redacted conference call numbers and passcodes, the disclosure of which, it says, would "harm the government's financial interest in maintaining the integrity of the commercial telephonic systems it contracts for." (ECF No. 35-2 at 2, 3, 13, 14.)

Rocky Mountain Wild responds that "[p]asscodes cannot be construed as 'sensitive information' protectable pursuant to Exemption 5." (ECF No. 36 at 33.) Rocky Mountain Wild provides no authority for this assertion, and it is not otherwise obvious why passcodes cannot be sensitive information. The Court accordingly finds that BLM appropriately invoked Exemption 5 as to this information.

    2.    <u>Exemption 6</u>

Exemption 6 applies to "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Under this authority, BLM redacted "a member of the public['s]" personal cell phone number and home address contained in an e-mail. (ECF No. 35-2 at 4.)[12]

Rocky Mountain Wild challenges this redaction, at least as to the phone number, arguing that "[p]hone numbers in emails are not similar to 'personnel or medical files' pursuant to Exemption 6." (ECF No. 36 at 33.) The case law is to the contrary. *See, e.g.*, *Judicial Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 152 (D.C. Cir. 2006)

_____

[12] The person's name is listed in the *Vaughn* Index as the sender of the e-mail, and so presumably his name was not redacted from the e-mail itself. Thus, BLM only asserts a privacy interest in his address and personal cell phone number.

("We have also read the statute to exempt not just files, but also bits of personal information, such as names and addresses, the release of which would create a palpable threat to privacy." (internal quotation marks omitted; alternations incorporated)).

To determine whether BLM appropriately withheld the phone number, the Court "must balance the private interest involved (namely, the individual's right of privacy) against the public interest (namely, the basic purpose of the Freedom of Information Act, which is to open agency action to the light of public scrutiny)." *Id.* at 153 (internal quotation marks omitted). Nonetheless, "[i]f there is no public interest in the disclosure of certain information, something, even a modest privacy interest, outweighs nothing every time." *Horowitz v. Peace Corps*, 428 F.3d 271, 278 (D.C. Cir. 2005) (internal quotation marks omitted).

Here, BLM's explanation for withholding this "member of the public['s]" phone number is generic: "[I]t was determined that the individual to whom this information pertains has a substantial privacy interest in withholding it." (ECF No. 35-1 at 21, ¶ 63.) Even so, Rocky Mountain Wild articulates no public interest in disclosure of this person's personal cell phone number. The Court therefore upholds BLM's invocation of Exemption 6 in this instance.

### IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.  BLM's Motion for Summary Judgment (ECF No. 35) is GRANTED IN PART and DENIED IN PART as stated above;

2.  Rocky Mountain Wild's Cross Motion for Summary Judgment or in the Alternative for a Stay of Briefing and Leave to Carry Out Rule 56(d) Discovery (ECF No. 37)

is DENIED;

3.    BLM shall conduct a new search for records existing between January 1, 2017, and November 3, 2017, regarding parcels considered for the March 2018 lease sale, about which BLM has not already conducted a search.  BLM shall conduct this search and produce responsive documents on a schedule that permits it to file a new summary judgment motion (as to this search alone) no later **than April 24, 2020**; and

4.    Nothing in this order shall be construed as interfering with the parties' ability to settle this case without the need for an additional search and/or additional summary judgment practice.

Dated this 23rd day of March, 2020.

BY THE COURT:

_____
William J. Martinez
United States District Judge